Filed 5/1/23 Toberoff & Associates v. Betancourt CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| TOBEROFF & ASSOCIATES, P.C., | B319116 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 18SMCV00170) |
| v. | |
| JOHN BETANCOURT et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, H. Jay Ford III, Judge. Affirmed in part, reversed in part.

Toberoff & Associates, Marc Toberoff and Jaymie Parkkinen for Plaintiff and Appellant.

Bostwick Law, Gary L. Bostwick; Drooz Legal and Deborah Drooz for Defendants and Appellants John Betancourt and Wildside Press, LLC.

Davis Wright Tremaine, Everett W. Jack, Jr., Eric M. Stahl and Zoë N. McKinney for Defendant and Appellant Blumhouse Productions, LLC.

Plaintiff Toberoff & Associates, P.C. (the firm or the Toberoff firm) filed suit against Alan Donnes, alleging that Donnes told lies and misrepresentations about the firm and its principal, Marc Toberoff,[1] to a group of the firm's clients who owned film rights to a popular science fiction story, causing the clients to terminate the firm's representation. After Donnes died, the firm filed an amended complaint against defendants John Betancourt, Wildside Press, LLC (Wildside), and Blumhouse Productions, LLC (Blumhouse),[2] alleging that these new defendants assisted Donnes in his scheme.

Betancourt and Wildside filed a special motion to strike the complaint under Code of Civil Procedure section 425.16[3] (the anti-SLAPP statute), as did Blumhouse. The trial court granted the motions with respect to certain allegations in the amended complaint and denied the motions as to others. The firm contends the court should have denied the motions in full, while defendants argue that it should have done the opposite and granted them in full. We agree with the firm. Even assuming the firm's allegations are based in part on speech regarding "a public issue or an issue of public interest" (*id.*, subd. (e)(4)), there is an insufficient "functional relationship . . . between the speech and the public conversation about [a] matter of public interest"

_____

[1] We refer to Toberoff & Associates as the firm to distinguish it from Marc Toberoff.

[2] The firm named two additional defendants who did not file anti-SLAPP motions and are not part of this appeal: Donnes's production company, The Little Movie Company, LLC (TLMC), and Donnes's former business partner, Gerald Daigle.

[3] Unless otherwise specified, subsequent statutory references are to the Code of Civil Procedure.

2

(*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149-150 (*FilmOn*)) to warrant the protection of the anti-SLAPP statute. We therefore reverse the trial court's order to the extent it granted defendants' motions.

## FACTUAL BACKGROUND AND PROCEEDINGS BELOW

In 1938, the science fiction author John W. Campbell, Jr. published a novella called Who Goes There? about a group of scientists at a research outpost in Antarctica under attack from a shapeshifting alien. Campbell sold the film rights for a flat fee, and in 1951, RKO Radio Pictures released an adaptation of the novella as the now classic film The Thing from Another World. Thirty years later, the novella was again adapted as a science fiction and horror film masterpiece, The Thing, directed by John Carpenter and released by Universal Pictures in 1982. Universal released a prequel adaptation in 2011 under the same title.

In 2015, Toberoff, whose firm specializes in representing holders of intellectual property rights, determined that a brief window had opened during which Campbell's heirs, who owned the copyright to Who Goes There?, could terminate Campbell's previous grant of film rights. Toberoff approached the heirs—Campbell's daughter, Leslyn Randazzo, and grandchildren Katea Hammond and John C. Hammond—who signed an engagement agreement in which they agreed to pay the firm 50 percent of any proceeds deriving from the rights the firm recovered on their behalf. The contract provided that if the firm succeeded in securing any rights to the work, its "entitlement to its full [f]ee shall 'vest' even if the [f]irm is subsequently discharged or terminated by the" heirs.

In January 2016, the firm served notices on the current holders of the film rights, including Universal, informing them

that the heirs intended to terminate the grant of rights to the novella pursuant to section 304 of the federal Copyright Act. (17 U.S.C. § 304(d).) The termination of rights was neither immediate nor complete, however. It did not take effect for two years, and even after it became effective, Universal would retain film rights to the novella in foreign territories, as well as all rights to story elements that had originated in the previous The Thing movies and were not present in the novel.

In the fall of 2016, Betancourt, a writer, editor, and publisher of science fiction novels, contacted the heirs, offering to manage Campbell's book rights. After Betancourt succeeded in obtaining money from other publishers on behalf of the heirs, the heirs signed an agreement to license Campbell's works to Betancourt's publishing company, Wildside, for publication and development of additional derivative works. The heirs told Betancourt about their agreement with the Toberoff firm, and Betancourt requested a copy of the contract. Betancourt wrote to one of the heirs that he would "reach out to [Toberoff] so we coordinate our efforts."

In 2017, Blumhouse, a film production company specializing in horror films, began exploring the possibility of producing another version of The Thing in 2017 as part of its production deal with Universal. According to the company's president, Charles Layton, Blumhouse soon learned about Toberoff's efforts to recover film rights on behalf of the heirs. Layton concluded that "the [h]eirs' rights were of limited value" because any commercially successful film would require the intellectual property rights that Universal still controlled.

Blumhouse offered[4] to purchase the heirs' rights, but Toberoff rejected the proposal as a "lowball offer." Toberoff made a counteroffer that Layton deemed "wildly unrealistic."

In November 2017, a researcher who was working on a book about the golden age of science fiction informed Betancourt that the researcher had discovered an unpublished manuscript by Campbell. This turned out to be an expanded version of Who Goes There? Betancourt wrote some additional material and edited the manuscript to turn it into a cohesive story, which Wildside published in 2019 under Campbell's original title, Frozen Hell. One month later, Betancourt emailed Toberoff, introducing himself and informing Toberoff of this new discovery. In an email to the heirs at around this time, Betancourt wrote that Toberoff was "welcome to be the driving force behind things in Hollywood, as long as he delivers. Recovering the movie rights is a major accomplishment and gets him a long grace period, to my mind."

In the summer of 2018, Donnes, an independent producer, entered the scene. In an email to Blumhouse, he claimed that Toberoff's efforts to recover the film rights had failed. RKO still owned the rights to Who Goes There? and Donnes implied he was working with RKO in some capacity. He needed to find "one final document" to prove his claim. Layton replied, "I LOVE that Toberoff has fucked up." Jason Blum, the CEO and namesake of Blumhouse, replied, "We need paperwork. [¶] And this could be the greatest news ever."

---

[4] Layton claims Blumhouse made this offer in November 2017, but Toberoff alleges it occurred around July 2018, closer in time to when Donnes became involved.

According to Toberoff, at around the same time, Donnes contacted him making the same assertions about RKO's rights to Who Goes There?  Donnes also claimed to have a close relationship with a production company at Universal, which Toberoff understood to mean Blumhouse.  When Toberoff told Donnes that he would need documentation from Donnes regarding his claim to the RKO rights before holding any further discussions, Donnes ceased communicating with him.

Donnes appears to have contacted the heirs at around the same time.  According to Betancourt, one of the heirs, John C. Hammond, told Betancourt in the summer of 2018 that he had spoken with Donnes about selling the film rights to Who Goes There? for a new adaptation.  Betancourt held a three-way phone call with Donnes and Hammond in which Donnes explained that he believed he could get a new version of The Thing made with Blumhouse.  According to Betancourt, the heirs were enthusiastic about the possibility, even as Toberoff refused to deal with Donnes.  Betancourt declared that "on or about August 29, 2018, . . . Hammond expressed the desire to terminate Toberoff's services and to allow Donnes to handle film rights to Who Goes There?" (italics omitted).

In an email dated August 30, 2018, Betancourt wrote to the heirs that he had spoken with Donnes, who "raised some concerns about . . . Toberoff's representation of media rights for 'Who Goes There?'/The Thing.  I have been considering the points he brought up, and—whether they are right or wrong—I do think this may be a good time for you to consider taking back control of media rights from . . . Toberoff.  The key issue to me is money: it's been years, and . . . Toberoff hasn't brought in any revenue for you.  A more aggressive marketing hand might have better

results." Betancourt acknowledged that "[r]ecovering the U.S. film rights to 'Who Goes There?' is a big achievement," and stated that the heirs "should be grateful to Toberoff for his work." He advised the heirs to take no action for now, and "If you part ways, it needs to be done carefully and in a way that does not get his back up."

Over the course of the following month, Donnes continued encouraging the heirs to terminate the Toberoff firm. On September 4, 2018, Donnes wrote an email to John Hammond and Betancourt offering to send a template termination letter. The next day, Donnes wrote the heirs that, if they canceled their agreement with the firm, Donnes's company would "pay any and all legal expenses billed by Mr. Toberoff, aside from his 50 [percent] share of any licensing fees." Donnes also offered the heirs "additional money for consulting work, executive producing, etc. These payments are NOT shared with Mr. Toberoff." He wrote that Toberoff was an obstacle to signing a deal because he would insist on receiving a producer credit and a high salary for himself as a part of any deal, and that Toberoff was "NOT wanted or welcome at any major studio and, to date, he has not produced a single film based on any of the over 40 story rights he has secured copyrights to." Donnes warned the heirs that Toberoff "is not working in your best interest."

Betancourt, who also received a copy of the email, replied that Donnes's proposal to pay the heirs' legal expenses "sounds more than fair." He also requested "[t]he draft [termination] letter to . . . Toberoff that you mentioned earlier. I would like to review it before the family sends it." In a declaration, Betancourt denied encouraging the heirs to terminate the Toberoff firm's representation, but stated that the heirs were "irked by

7

[Toberoff's] failure to communicate with them, his failure to listen to their objectives for Campbell's writings and legacy, and his refusal to meet with Donnes."

On September 26, 2018, Donnes wrote an email on behalf of his production company, TLMC, promising to "pay all reasonable costs incurred and billed to you by Marc Toberoff and Associates. Additionally, TLMC will provide legal representation, at our cost, to represent you should he file any litigation related to his termination and/or production of the feature film."

Betancourt wrote to the heirs, "I think [Donnes's email] will do to protect you and move forward. Do you want me to send the termination letter to Toberoff on your behalf tomorrow?" The heirs agreed that Betancourt should send the letter, and on September 27, he did so.

Toberoff was blindsided by the termination letter. He "had received no indication of any kind from [the heirs] that [the firm's] services and performance were not fully satisfactory." In an email to the heirs that evening, Betancourt wrote that Toberoff had called him and given him "a 45[-]minute harangue about his greatness and our collective stupidity."

On October 3, 2018, Donnes wrote to several Blumhouse employees informing them of the termination and suggesting a conference call with the heirs. According to Betancourt, in the conference call, Blum outlined a vision for a new adaptation. Betancourt referred the heirs to a new lawyer to represent them in negotiations. Betancourt wrote that "Alan Donnes recommended him, and once again Alan seems to have had your best interests in mind."

Three days later, Betancourt wrote to the heirs that he had spoken with Toberoff again: "Toberoff has concluded that Alan

Donnes is responsible for his dismissal, based on the timing. (He is a smart guy.)" According to Betancourt, Toberoff said that Donnes was "a fraud" with "[n]o real track record in the industry, trying to insert himself in a deal unnecessarily as a money grab."

In the same email, Betancourt wrote to the heirs about his own research "into Blum and Blumhouse Productions. They specialize in low-budget movies. I'm not sure this is necessarily the best thing for The Thing. You may, in fact, be better served by going back to Toberoff and giving him a year to make a deal. If nothing happens, that's cause for dismissal." Betancourt encouraged the heirs to schedule a conference call with Toberoff and listen to him.

On November 6, 2018, Toberoff filed a complaint against Donnes and additional unnamed Doe defendants, alleging causes of action for intentional and negligent interference with contractual relations, and intentional and negligent interference with prospective economic advantage. The complaint alleged that Donnes made false and misleading statements to the heirs about his relationship with Universal and his control of film rights to The Thing. According to the complaint, Donnes also made false statements about Toberoff in an effort to convince the heirs to end their representation. The complaint alleged that Donnes acted "on his own, or in coordination with other Doe defendants" (capitalization omitted) in convincing the heirs to fire Toberoff. The complaint mentioned Betancourt as the author of the termination letter and alleged that he was "aligned with Donnes," but did not accuse Betancourt of any misconduct. The complaint did not mention Blumhouse at all.

In November 2019, the heirs agreed to sell the film rights to Who Goes There?, including the unpublished portions that

9

were discovered in Frozen Hell, to Universal for $80,000. The parties attributed 70 percent of the sale price to the original Who Goes There? and the remaining 30 percent to the previously unpublished material from Frozen Hell. The vast majority of the contract terms have been redacted from the copy of the contract in the record.

In July 2020, Donnes died. In July 2021, the court, upon learning the sole named defendant in the case had passed away, allowed the Toberoff firm five days to file an amended complaint naming the previously unnamed Doe defendants.

On July 14, 2021, the firm filed the operative first amended complaint. The new complaint alleged the same causes of action for intentional and negligent interference with contractual relations and with prospective economic advantage, as well as a new cause of action for unfair competition. In place of Donnes, the complaint listed as defendants TLMC, Donnes's business partner Daigle, Betancourt, Wildside, and Blumhouse. The firm alleged that the "[d]efendants joined forces and approached the [heirs] directly through Donnes with misrepresentations and derogatory statements regarding [Toberoff], aimed at alienating [Toberoff] and ultimately inducing the [heirs] to terminate without cause their relationship with [the firm], causing significant financial loss to both the [heirs] and [the firm]."

According to the firm, Betancourt's role in the scheme was to make false and misleading statements to the heirs to encourage them to terminate the firm's representation. Betancourt agreed to participate because he believed he stood to benefit from a new film adaptation both by means of a direct payment for the film rights to the newly published Frozen Hell, and in increased publishing revenue from the novel and potential

10

sequels. The complaint was vague as to Blumhouse's role, alleging that Blumhouse "acted in concert" with Donnes and "fashioned a scheme" with him, but it did not allege that anyone at Blumhouse took any specific action to disparage Toberoff or convince the heirs to terminate the firm.

The firm alleged that defendants succeeded in reducing Universal's total payment to the heirs for the film rights, which in turn reduced the firm's compensation. In addition, the firm blamed defendants for structuring the payments to the heirs in a manner unfavorable to the firm. This was because the contract with Universal for the sale of the film rights attributed 30 percent of the purchase price for the film rights to the newly published Frozen Hell, rather than the rights to the original novella that the firm had recovered for the heirs. In addition, the firm alleged that defendants arranged for the heirs to receive payment as executive producers of the new The Thing movie.

In September 2021, Blumhouse filed a special motion to strike under the anti-SLAPP statute, as did Betancourt and Wildside. In the motions, the defendants alleged that the firm's causes of action arose from the defendants' "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

The trial court granted the motion in part. The court focused on nine specific misrepresentations that the firm alleged in the complaint: "(i) that Donnes owns or controls intellectual property rights or interests of RKO, or others, that are required for the production of any new derivative film or other work based . . . upon the [r]ights and/or entitled 'The Thing'; (ii) that Donnes

11

has a very close relationship with Universal and/or a production company at Universal, which, in addition to his/RKO's intellectual property, is critical to an agreement with Universal regarding any new film(s) based upon the [heirs'] [r]ights; (iii) that Donnes could finance a film based on the [r]ights; (iv) that Donnes is therefore a necessary participant in any deal regarding a new film or other work based upon the [r]ights; (v) that [d]efendants would secure for the [heirs] very favorable terms for their [r]ights, 'executive producer' credit(s) and acting role(s) on a new film based on the [r]ights; (vi) that [the firm] supposedly did not care about the [heirs], is not working in their best interests, and is taking advantage of them; (vii) that [the firm] purportedly botched lucrative deals for the [r]ights; (viii) that [the firm] failed the [heirs] because it failed to generate any revenue from the [r]ights for 'years'; and ([ix][5]) that Donnes and Betancourt have the wherewithal to secure agreements for the [heirs] for a new film(s) and other derivative works based on the [r]ights (which [the firm]) recovered for the [heirs]) on extremely favorable financial terms."

The trial court categorized six of these statements, those labeled (i), (ii), (iii), (iv), (v), and (ix), as the "[f]ilm [s]tatements," because these statements pertained to Donnes's position in the entertainment industry and ability to produce a film. The three remaining statements, those numbered (vi), (vii), and (viii), the court labeled "[d]erogatory [s]tatements," because those statements attacked Toberoff and the firm.

---

[5] In a typographical error in the first amended complaint, the firm labeled both of the last two statements as "(viii)." To distinguish between them, we refer to the last of the statements as (ix).

The court concluded that the film statements were protected conduct under the anti-SLAPP statute because they expressly referred to a potential remake of The Thing, and because they were made to the heirs in connection with efforts to obtain the rights to remake the film. The court reasoned that, "Acquisition of the rights to make the film is directly related to the making of the film." On the other hand, the derogatory statements were not protected conduct because they did not implicate a remake of " 'The Thing,' " but rather were "directed entirely at disparaging [the firm]'s performance and abilities as an agent and attorney of the" heirs. The court found that the firm had failed to demonstrate a probability of prevailing on its claims arising from the film statements, and accordingly granted the anti-SLAPP motion with respect to those statements while denying it as to the claims arising from the derogatory statements. The court also struck the firm's second cause of action, for negligent interference with contract, in its entirety because the firm conceded that California does not recognize such a cause of action.

## DISCUSSION

### A.  Governing Law and Standard of Review

"The Legislature enacted . . . section 425.16 to address so-called strategic lawsuits against public participation (SLAPP). [Citation.]  [The] anti-SLAPP statute makes available a special motion to strike meritless claims early in litigation—but only if the claims arise from acts in furtherance of a person's 'right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' (§ 425.16, subd. (b).)"  (*FilmOn*, *supra*, 7 Cal.5th at p. 139, fn. omitted.)

13

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712 . . . .) If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) We review the trial court's decision to grant or deny an anti-SLAPP motion de novo. (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 816 (*Musero*).)

In this case, the first step of the anti-SLAPP analysis is dispositive, and we therefore describe the law only as it pertains to that step.

Section 425.16 lists four categories of protected activity. The first three of these apply to statements made in or in connection with "official proceeding[s] authorized by law" (*id.*, subd. (e)(1)-(2)) or "in a place open to the public or a public forum in connection with an issue of public interest." (*Id.*, subd. (e)(3).) At issue in this case is the fourth, so-called "catchall provision" (*FilmOn*, *supra*, 7 Cal.5th at p. 144), which protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

Because it comes immediately after the other three provisions and "refers to '*other* conduct in furtherance,' " the Supreme Court has interpreted the catchall provision as "encompass[ing] conduct and speech similar to what is referenced in section 425.16, subdivision (e)(1) through (3)." (*FilmOn*, *supra*, 7 Cal.5th at p. 144.) In other words, when considering whether

14

conduct fits within the catchall provision, just as with the other three provisions of section 425.16, subdivision (e), a court must consider "not only . . . its content, but also . . . its location, its audience, and its timing." (*FilmOn, supra,* at p. 143.) Although purely private communications by for-profit entities are not excluded from the protection of the statute, we must bear in mind that "[t]he anti-SLAPP law was enacted 'to protect nonprofit corporations and common citizens "from large corporate entities and trade associations" in petitioning government.' [Citation.]" (*Ibid.*)

To this end, the court in *FilmOn* articulated a two-step inquiry[6] for determining whether the activity from which a lawsuit arises is protected under the catchall provision. "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn, supra,* 7 Cal.5th at pp. 149-150.)

In practice, "virtually always, defendants succeed in drawing a line—however tenuous—connecting their speech to an

---

[6] The *FilmOn* inquiry is thus a two-step test within the larger two-step test for resolving an anti-SLAPP motion. (See *Baral v. Schnitt, supra,* 1 Cal.5th at p. 384.) We apply the *FilmOn* test in cases involving the catchall provision to determine whether the defendant has met its burden at the first step of the overall anti-SLAPP analysis: to show "that the challenged claim arises from activity protected by section 425.16." (*Baral v. Schnitt, supra,* at p. 384.)

abstract issue of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 150.)  Indeed, as the court explained in its subsequent decision on this subject, *Geiser v. Kuhns* (2022) 13 Cal.5th 1238 (*Geiser*), "*FilmOn*'s first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Id*. at p. 1253.)  For this reason, "it is *FilmOn*'s second step, not its first, that usually plays the more prominent role in screening anti-SLAPP motions." (*Id*. at p. 1250.)

To satisfy the second step of the *FilmOn* test, there must be " 'some degree of closeness' between the challenged statements and the asserted public interest.  [Citation.]  . . . '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.'  [Citations.]" (*FilmOn*, *supra*, 7 Cal.5th at p. 150.)  At this stage, "our inquiry does not turn on a normative evaluation of the substance of the speech.  We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id*. at p. 151.)

*FilmOn* and *Geiser* provide examples of the application of this test when there is (in the case of *Geiser*) or is not (in the case of *FilmOn*) a sufficient connection between the speech and a matter of public interest.  The defendant in *FilmOn* was a business offering tracking and verification services to internet advertisers.  In private reports to its clients, it flagged certain websites owned by plaintiff FilmOn, asserting that the websites

16

contained adult content and facilitated copyright infringement. (*FilmOn, supra*, 7 Cal.5th at p. 141.) FilmOn sued for trade libel, tortious interference with contract, and other causes of action, and the defendant filed an anti-SLAPP motion. The Supreme Court held that the defendant's reports did not qualify for protection under the catchall provision. (*Id.* at p. 154.) The court assumed the motion passed the first part of the test because there was a connection between the defendant's conduct and an issue of public importance—children's exposure to sexually explicit content. (*Id.* at p. 152.) Even so, the anti-SLAPP motion failed the second part of the test because the defendant's statements did not "further[ ] the public conversation on an issue of public interest." (*Id.* at p. 153.) The defendant's reports were issued privately to paying clients for business purposes alone. "The information never entered the public sphere, and the parties never intended it to." (*Ibid.*) Although "no single element is dispositive" (*ibid.*), these factors in combination were decisive.

The court reached the opposite conclusion in *Geiser, supra*, 13 Cal.5th 1238. That case began when a real estate developer promised to work with two homeowners to allow them to recover their property from foreclosure, before evicting them when they were unable to arrange a repurchase quickly enough. The homeowners enlisted the help of a community group, which organized a protest outside the home of the developer's chief executive officer. The developer filed a petition for a civil harassment restraining order against the homeowners and the director of the community group, and the defendants responded with an anti-SLAPP motion. (*Id.* at pp. 1243-1245.)

The court held that the defendants' conduct met both steps of the *FilmOn* test, and that the defendants were entitled to

17

protection under subdivision (e)(4) of the anti-SLAPP statute. (*Geiser*, *supra*, 13 Cal.5th at p. 1243.) In particular, the defendants' actions satisfied the second step of the *FilmOn* analysis because "[t]he context makes clear that this sidewalk protest furthered public discussion of the public issues it implicated." (*Geiser*, *supra*, at p. 1255.) All parties, including the members of the community organization and the developer, appeared to understand that "the demonstration was not only about the dispute over the [homeowners]' long-term residence, but also about broader issues concerning unfair foreclosures and evictions." (*Ibid.*)

Two recent Court of Appeal opinions have applied the *FilmOn* test in cases involving the production of film and television. In *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027 (*Ojjeh*), the plaintiff invested in the defendants' documentary about the refugee crisis in Syria, then sued the defendants for breach of contract and fraud, claiming they had done no significant work toward making the film. (*Id.* at p. 1032.) The court applied the *FilmOn* test and held that the plaintiff's claims were based on protected conduct within subdivision (e)(4) of the anti-SLAPP statute. The court noted that, unlike the purely private communications in *FilmOn*, the documentary was intended for a public audience. (*Ojjeh*, *supra*, at p. 1043.) The defendants' "efforts in obtaining the interview footage of individuals affected by and involved in the refugee crisis and in maintaining an online journal of refugees' stories were directly related to the asserted issue of public interest and were undertaken to contribute toward the public discourse on the matter. Likewise, [the] defendants' efforts to secure funding for the documentary's production [were] functionally related to the advancement of its

18

message." (*Id.* at p. 1044.) The court concluded that, "This 'union of content and context' ([*FilmOn*, *supra*, 7 Cal.5th] at p. 154) leads us to conclude there is a sufficient ' "degree of closeness" ' between the challenged conduct and the promotion of the film's message to merit application of the catchall provision. (*Id.* at pp. 149-150.)" (*Ojjeh*, *supra*, at p. 1044.)

In *Musero*, by contrast, the court held that a talent agency was not entitled to anti-SLAPP protection in a screenwriter's lawsuit for idea theft. The plaintiff alleged that he submitted a pilot script for a television drama titled *Main Justice* to his agent, who then used the plaintiff's ideas to assist another writer in developing a similar show with the same title. (*Musero*, *supra*, 72 Cal.App.5th at pp. 808-809.) The agency filed an anti-SLAPP motion. The court held that the motion failed at the second step of the *FilmOn* analysis. Although the creation of the competing program "would be a topic of widespread public interest," the court concluded that "the degree of connection between [the allegedly wrongful] statements and that topic of public interest [was] insufficient to warrant protection under section 425.16, subdivision (e)(4), as construed in *FilmOn*." (*Musero*, *supra*, at p. 821.)

The court noted that "the alleged misappropriation of Musero's ideas was done privately and, according to Musero's theory, from [the agent to the competing writer] during the many telephone conversations that took place between them while [the competing writer] was developing *Main Justice*. Although communications between private individuals may qualify as protected activity in some circumstances (see *FilmOn, supra*, 7 Cal.5th at p. 146; [citation]), the private nature of the communications 'makes heavier [a defendant's] burden of

19

showing that, notwithstanding the private context, the alleged statements nevertheless contributed to discussion or resolution of a public issue for purposes of subdivision (e)(4) [of section 425.16].' [Citation.]" (*Musero, supra*, 72 Cal.App.5th at p. 821.)

## B. Defendants' Motions Fail at the Second Step of the *FilmOn* Analysis

In applying this body of law to the present case, we need not decide whether any of defendants' conduct alleged in the complaint satisfies the first step of the *FilmOn* analysis—that is, whether "the speech at issue . . . implicate[s] issues of public interest" (*Geiser, supra*, 13 Cal.5th at p. 1252)—because even assuming that it does, defendants have not satisfied the second part of the test. They have not shown a "functional relationship . . . between [their] speech and the public conversation about some matter of public interest." (*FilmOn, supra*, 7 Cal.5th at pp. 149-150.)

The key factor in our analysis is that all the speech[7] at issue in this case occurred in the course of private, for-profit

---

[7] The Supreme Court has instructed that, in evaluating an anti-SLAPP motion, "to the extent [the plaintiff] has alleged various acts as a basis for relief and not merely as background, each act or set of acts must be analyzed separately under the usual two-step anti-SLAPP framework." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012.) For this reason, the trial court considered each of the nine alleged misrepresentations in the first amended complaint separately, finding that the "film statements" were protected activity, while the "derogatory statements" were not. We disagree with this division, because all of the alleged misrepresentations were part of a single effort to convince the heirs to fire the Toberoff firm. All nine statements

business. Although the Supreme Court has stressed that "no single element is dispositive" (*FilmOn*, *supra*, 7 Cal.5th at p. 153) in determining whether a defendant's speech is entitled to protection under the anti-SLAPP statute, the defendant's burden becomes "heavier" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 903) when the speech occurs in private. It is difficult for a defendant to show that its statement "contributes to or furthers the public conversation" (*FilmOn*, *supra*, at p. 154) when the statement was never intended for, and never reached, a wide audience. For this reason, the public protest in *Geiser* was protected activity (*Geiser*, *supra*, 13 Cal.5th at p. 1243), and the private report by the defendant in *FilmOn* was not. (*FilmOn*, *supra*, at p. 154.)

Defendants argue that the conduct on which the firm's complaint is based was not purely private. Even if the immediate audience of the statements identified in the complaint was limited, defendants contend that their conduct was functionally related to the production of a new The Thing movie, which, if made, would be released publicly. They compare their own speech to that at issue in *Ojjeh*, where the court held that the defendants' speech was protected under the anti-SLAPP statute even though their efforts to raise funding for, and then to produce, a documentary, presumably occurred outside the public eye. The court reasoned that the fundraising "was functionally related to the advancement of" the film's message because it "was necessary for production, postproduction, promotion, and distribution of the film." (*Ojjeh*, *supra*, 43 Cal.App.5th at

---

have the same connection to protected activity, and we analyze them together in this opinion.

21

p. 1044.)  Defendants argue that their alleged statements regarding the heirs' film rights were a necessary part of the eventual production of a new The Thing movie.

We are not persuaded.  The logical consequence of defendants' position would be to ignore the second step of the *FilmOn* analysis such that virtually any lawsuit related to the potential making of a film or television program for public consumption would be entitled to protection under the anti-SLAPP statute, because the defendant in any such case could argue that its actions were necessary preliminary steps for the potential production of the film or movie.  The court in *FilmOn* developed its two-part test to avoid this type of conclusion.  Because "virtually always, [the] defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest" (*FilmOn*, *supra*, 7 Cal.5th at p. 150), the first step of the analysis alone is insufficient.[8]

Defendants overlook differences between the circumstances of this case and those in *Ojjeh*.  In *Ojjeh*, the defendants had done concrete work to fund and produce a specific documentary film— including protected activity such as obtaining interview footage and maintaining an online journal of refugees' stories related to the content and message of any eventual film.  Indeed, the court found that the plaintiff's "allegations concern affirmative conduct

---

[8] In their briefs, defendants place great emphasis on the *Geiser* court's statement that a defendant's speech "may reasonably be understood to implicate a public issue, even if it also implicates a private dispute."  (*Geiser*, *supra*, 13 Cal.5th at p. 1253.)  But this statement applies to "*FilmOn*'s first step."  (*Ibid*.)  It is of minimal relevance in determining whether a defendant's conduct also satisfies the second step.

regarding the quality and quantity of the performance [the defendants] rendered in connection with the production of the documentary." (*Ojjeh, supra*, 43 Cal.App.5th at p. 1038.) In this case, by contrast, there is no indication in the record that anyone involved had more than a hazy and inchoate idea of what a future The Thing movie would involve. And the dispute over whether or not Toberoff and his firm were competent or had the heirs' best interests at heart had nothing to do with the content of any finished product, and did nothing to contribute to any public debate or conversation. To the extent *Ojjeh* holds that all actions related to the production of a movie establish "a sufficient ' "degree of closeness" ' between the challenged conduct and the promotion of the film's message to merit application of the catchall provision" (*id*. at p. 1044), we respectfully decline to follow that portion of its holding.

Instead, we are persuaded by the court's reasoning in *Musero*. In that case, the plaintiff alleged that the defendant misappropriated the plaintiff's script to assist a competing writer. The competing writer was surely engaged in preparatory work necessary for the production of a television program based on his own script, but the court held that "the degree of connection between [the defendant's] statements and that topic of public interest is insufficient to warrant protection." (*Musero, supra*, 72 Cal.App.5th at p. 821.) In part, this was because the alleged misappropriation did not contribute much to the second writer's script. Even if the premises of the two shows bore surface similarities, those similarities "contribute nothing to the discussion of the issue of public interest identified by the [defendants] or the trial court." (*Id*. at p. 822.) The same is true with regard to the private statements made here about who was

23

best positioned to help exploit potential film rights; "when the context and content of the specific, allegedly wrongful statements at issue here are considered, the degree of connection between those statements and [the] topic of public interest is insufficient to warrant protection under section 425.16, subdivision (e)(4), as construed in *FilmOn*." (*Musero*, *supra*, at p. 821.)

Defendants attempt to distinguish *Musero* by noting that during the events of that case, the public was unaware of the existence of *Main Justice*, the allegedly infringing program that the defendant helped produce. By contrast, The Thing series enjoys a wide following, as defendants have amply shown in the voluminous media clippings on the franchise they have submitted for judicial notice. But the court in *Musero* did not reject the defendants' anti-SLAPP motion because of a lack of public interest in the subject matter. Indeed, the court acknowledged that "a proposed television series not only based on the life of former Attorney General [Eric] Holder but also apparently created in part by him would be a topic of widespread public interest." (*Musero*, *supra*, 72 Cal.App.5th at p. 821.) The key factor, both in *Musero* and here, is not the popularity or public awareness of a future film nor whether there is some connection between the defendant's statement and an issue of public interest. Rather, it is whether the statement "contributes to— that is, 'participat[es]' in or furthers—some public conversation on the issue." (*FilmOn*, *supra*, 7 Cal.5th at p. 151.) Defendants have not met this burden with regard to the allegations here, so they are not entitled to the protection of the anti-SLAPP statute.

Because defendants have failed to show that the firm's allegations arise from activity protected under section 425.16, we need not consider whether the firm has demonstrated a

24

probability of prevailing on the merits of any of its claims. (See *Musero*, *supra*, 72 Cal.App.5th at p. 823.) Nor do we need to consider the Toberoff firm's argument that the trial court erred by denying its request to conduct discovery in defending against the anti-SLAPP motions.

## DISPOSITION

The trial court's order regarding the defendants' anti-SLAPP motions is reversed to the extent it granted the motions. In all other respects, the order is affirmed. The Toberoff firm is awarded its costs on appeal.

NOT TO BE PUBLISHED.


WEINGART, J.


We concur:


CHANEY, J.


BENDIX, Acting P. J.